UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARIADNA JACOB *and* INFLUENCES,
INC.,

                              Plaintiffs,

         – *against* –

TAYLOR LORENZ *and* THE NEW YORK
TIMES COMPANY,

                              Defendants.

**OPINION & ORDER**

21 Civ. 6807 (ER)

RAMOS, D.J.:

Ariadna Jacob and her company, Influences, Inc., brought this libel suit on August 12, 2021 against Taylor Lorenz and her then-employer The New York Times for an allegedly defamatory article written by Lorenz and published by the New York Times.  Doc. 1.  The plaintiffs filed an amended complaint on November 19, 2021.  Doc. 13.  Pending before the Court is the defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  Doc. 16.  For the reasons set forth below, the motion is granted.

I.       **BACKGROUND**

The following facts are based on the allegations in the Amended Complaint, which the Court accepts as true for purposes of the instant motion.[1]  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Jacob is domiciled in Nevada and is the founder and CEO of Influences, Inc., a Delaware corporation with its principal place of business in Nevada.  ¶¶ 3, 4, 12.  Jacob is in the business of managing, counseling, and guiding "influencers," or people who

---

[1] Unless otherwise noted, all references to ¶ __ refer to the Amended Complaint, Doc. 13.

market themselves as well as products and services, on TikTok, the social media platform in which users share short videos.  ¶ 13.  Jacob is also known to have maintained so-called collaborative houses where young influencers would live and work.[2]  Jacob is familiar with computer coding, search engine optimization, and social media, and she has a background in marketing and branding.  ¶ 14.  At one point, Influences represented over 85 TikTok content creators.

The defendant Lorenz, at all relevant times, was a technology columnist for The New York Times.  ¶ 19.  On August 10, 2020, Lorenz contacted Jacob via text message and requested a call with her.  ¶ 20.  Prior to the phone call, which ultimately never occurred, Jacob found out that Lorenz was writing a story on allegations of impropriety against Jacob and Influences.  ¶ 21.  Lorenz then sent an email containing 27 questions at noon and requested that Jacob respond by 9 a.m. the next day.  ¶ 22.  Jacob and her attorney responded with documentation and offered to provide additional documentation on background. ¶ 24.  Lorenz responded with 12 additional questions, to which Jacob promptly responded.  ¶ 24.  Lorenz responded with an email purporting to summarize the facts and an additional 12 questions.  *Id.*  Jacob again responded with documentation refuting several of the allegations.  *Id.*

On August 14, 2020, the defendants published the article entitled, "*Trying to Make It Big Online? Getting Signed Isn't Everything*" (the "Article").  ¶ 27; Doc. 18-1.  The sub headline read:  "*Young people come to Los Angeles in droves with dreams of fame and fortune.  Once they're discovered, it's not always sunny.*"  *Id.*  Below the headline was a picture of Jacob and a number of influencers she represented.  ¶ 28.  The caption of the picture says that the influencers' dreams were turned "into a living nightmare."  *Id.*  The Article includes numerous

---

[2] The three influencer houses mentioned in the Article were known as Girls in the Valley, Kids Next Door, and Drip Crib.

statements that Jacob alleges are false and that she had refuted to Lorenz prior to the Article's

publication.  These statements include:

- Quotes from two former clients, Marcus Olin and Jesse Underhill, who lived in
  the "Kids Next Door" ("KND") influencer house.  ¶¶ 29–30.

  - **Statement 1[3]**:  Olin was quoted as saying:  "We went into this thinking
    we'd have brand deals weekly or monthly . . . We were expecting a quota
    where we could pay our half of rent through brand deals.  But we weren't
    getting enough deals to cover our half of rent."  Doc. 18-1 at 2.

  - **Statement 2**: Underhill was quoted as saying:  "We didn't have working
    Wi-Fi for a month . . . We couldn't go live because our livestreams would
    cut out."  *Id.* at 3.

    The plaintiffs allege that Underhill had financial struggles not because of
    any actions by Jacob, but rather because of his account suspension due to
    failure to follow user guidelines, a fact about which Lorenz was made
    aware.  ¶ 31.

  - **Statement 3**:  "At the end of July, the influencers were told [by plaintiffs]
    that they would have to cover a larger share of rent [at the KND house].
    They all felt the crunch, and the dream of living and working in a mansion
    with friends turned into a 'living nightmare,' Mr. Underhill said.  By early
    August, half of the residents had moved out.  The house itself has been re-
    listed for sale on Zillow."  Doc. 18-1 at 3.

    The plaintiffs allege they merely demanded compliance with the
    influencers' contractual obligations.  ¶ 32.

- Statements regarding Brittany Tomlinson, a TikTok creator who would later
  become plaintiffs' client:

  - **Statement 4**:  Jacob had messaged Tomlinson, via Twitter direct message,
    asking "I'm seeing this image of you going around a lot, have you made
    any money?"  Doc. 18-1 at 4.

    The plaintiffs allege that messages demonstrate that this was false and
    defendants did not ask the plaintiffs about this prior to publication.  ¶ 34.
    The plaintiffs allege that this statement "sets the tone" to portray plaintiffs
    as "unethical and unscrupulous," demonstrating defendants' "reckless
    disregard for the truth."  *Id.*

---

[3] While the plaintiffs did not number the statements in their complaint, both parties did so in their motion papers.
For the sake of clarity, the Court adopts the numbering of the statements adopted by the parties.

o **Statement 5:**  Tomlinson flew to Los Angeles in September 2019 and stayed at Jacob's apartment.  The Article states: "'[Jacob is] buying me lunch and dinner.  She claims she's mentored by Gary Vee,' said Ms. Tomlinson, referring to the entrepreneur Gary Vaynerchuk.  'I met all these people who she said will help my career.' (Mr. Vaynerchuk said he has no affiliation with Influences.)"  Doc. 18-1 at 4.

The plaintiffs allege that this was misleading, as mentorship is not the same as affiliation, and Vaynerchuk even offered Tomlinson a spot in a super bowl commercial because of his relationship with Jacob.  ¶ 35.

o **Statement 6:**  "'By January, I realized I hadn't been paid since Halloween,' [Tomlinson] said.[4]  Ms. Tomlinson reached out to the brands she'd worked with and discovered that she was owed tens of thousands of dollars.  In April, she filed a complaint with the California Labor Commission, on the grounds that Ms. Jacob had violated California law by operating as a talent agency without a license.  In it, she claims Ms. Jacob is withholding $23,683.82 in fees; that Ms. Jacob 'demanded unconscionable fees' of up to 20 percent commission; and that Ms. Jacob bought and is squatting on the domain name bittanybroski.com."  Doc. 18-1 at 4.

The plaintiffs allege that Tomlinson was not signed to Influences, as this statement suggests, but rather to Creator Edge, another company in which Jacob was one-third owner.[5]  ¶ 37.  Further, the fees were not withheld but simply had not yet been paid by the brands.  ¶ 38.

o **Statement 7:**  Quotes from other talent managers regarding allegations that Jacob tried to lock creators into contracts, ¶ 39:  "'In an ethical management talent relationship you should be able to part ways at any time,' said Lisa Filipelli, a partner at Select Management Group, a digital talent management firm.  'Any management contract with a creator should be at will.  Less mature companies have manipulated what the word 'signed' means.'  Chas Stahl of Right Angle Management said that forcing a client to stay when their relationship with a manager has soured is unheard-of.  'Trust in the relationship is so key,' he said.  'Without you can have all the paperwork between the talent and a manager, but if you don't have the trust in place it's not going to work.'"  Doc. 18-1 at 5.

---

[4] This first sentence of Statement 6 is not included in the defendants' chart enumerating each statement, but is discussed by the plaintiffs as part of Statement 6.

[5] The plaintiffs do, however, acknowledge that Tomlinson's contract states that Creator Edge does business as Influences.  ¶ 37 n.3; Doc. 18-5 at 2.  They nonetheless argue that the contract is incorrect, as Creator Edge and Influences are distinct legal entities affiliated only because of their common owner, Jacob.  ¶ 27 n.3.  They also note that Creator Edge and not Influences signed the agreement.  *Id.*; Doc. 18-5 at 5.

- Statements regarding "The Girls in the Valley" ("GIV") influencer house, managed by Influences

  - **Statement 8:**  Quotes from Tianna Singer, a TikTok content creator whom the Article claims was managed by Influences, and her mother, Salam Singer, ¶¶ 40–42:  "'She promised brand deals, money and opportunities,' Ms. Singer said.  'Everyone was promised income, but that never happened.' . . . [Salam] Singer didn't expect things to devolve as quickly as they did.  She described Ms. Jacob's behavior in the end as 'shameful.'  'It's a very predatory environment,' Ms. Singer said of the industry.  'You have a situation where you have young vulnerable people with the potential to access a lot of money, then you have older people who are going to take advantage of the situation.  Tianna's not going to be the first or the last.'"  Doc. 18-1 at 5, 7.

  - **Statement 9:**  "[Tianna's] housemates said that Ms. Jacob put a lot of pressure on them.  'She would show up at all times of the night,' Ms. Singer said.  'She'd come as late as 1 a.m., and she'd be texting us until 3 a.m. and show back up at 10 a.m.  She'd bring guests with her without telling us.'  There was a security camera in the kitchen of the house, which Ms. Singer said was installed 'without our consent' and connected to Ms. Jacob's phone.  Ms. Jacob said that the cameras were installed by the property owner for security purposes."  Doc. 18-1 at 5.

    The plaintiffs allege that Singer was not managed by Influences, but rather was allowed to stay in the GIV house in exchange for signing a release of liability and non-disclosure agreement, which included a provision agreeing to the security camera.  ¶¶ 40, 42.  The plaintiffs allege that Lorenz never investigated or asked about this issue, or else plaintiffs had refuted the information to Lorenz.  *Id.*

  - **Statement 10:**  "The creators in the house said that on June 7, Ms. Jacob told them they would be thrown out if they didn't post on social media at least eight times a day."  Doc. 18-1 at 5.

    The plaintiffs allege that this is false, as the residents were asked to leave because of a failure to honor their contractual obligations and ethical violations.  ¶ 43.  Specifically, Singer was asked to leave due to hosting parties during a COVID-related quarantine, underage drinking, and "becoming a deadbeat influencer" who did not generate "results."  ¶ 45.

  - **Statement 11:**  "'We were often very intimidated by [Jacob] because the conversations became explosive,' said Ms. Singer.  In mid-June, Ms. Singer and others left the house.  They described a hectic move-out day that involved an escalating verbal fight with Ms. Jacob which resulted in several calls to local authorities to intervene.  The group documented the

day's events on Instagram Stories; Ms. Jacob said she asked not to be filmed, but she recorded the events too.  In an email from her lawyer, Ms. Jacob denied that a fight took place."  Doc. 18-1 at 5–6.

The plaintiffs allege that defendants knew these statements were a lie because they knew it was Jacob who had called authorities twice on the residents as a result of their threatening behavior and vandalism.  ¶ 47.

- Statements regarding the "Drip Crib" influencer house

  - **Statement 12:**  Statement from Devion Young, a former client:  "'She manipulates you, it's a nightmare,' Mr. Young said.  He said that she used nude photos of his to shame him.  'Right before we parted ways she leaked my nudes and sent them to business partners, people in my house and potential investors to slander my name, saying I was unprofessional,' Mr. Young said.  'Ms. Jacob informed an internal consultant of the picture's existence,' Ms. Jacob's lawyer wrote, and clarified that she did not 'publicly' leak the photos."  Doc. 18-1 at 6.

    The plaintiffs allege that the implication that Jacob did leak the photos is false because Young told Jacob that the leak of his nude photos had nothing to do with her.  ¶ 49.

  - **Statement 13:**  "On June 9, Influences split from [the Drip Club influencer house] too, over disputes about rent.  On its Instagram account, Influences said that members of the Drip Club breached their contract and failed to pay their share of rent."  Doc. 18-1 at 6.

    The plaintiffs allege that this statement was false because the falling out had nothing to do with rent, as a separate article hyperlinked in the Article demonstrates that Drip Crib had issues paying rent to a third party, not plaintiffs.  ¶ 50.

- Statements regarding Ellie Zeiler, a TikTok influencer

  - **Statement 14:**  "Sarah Zeiler, 46, met Ms. Jacob in April when Ms. Jacob attempted to sign Ms. Zeiler's 16-year-old daughter, Ellie, to a management contract.  Ms. Zeiler declined but soon discovered that Ms. Jacob had already added Ellie to the talent portion of an Influences marketing deck.  Ms. Zeiler emailed Ms. Jacob and asked her to remove Ellie's name and image from the deck and to stop referring to herself as Ellie's manager.  'Ellie had heard from a few different notable people to be careful because [Jacob] will tell everyone that she represents you, and that's exactly what happened,' Ms. Zeiler said.  Last week, Ms. Zeiler discovered that Ms. Jacob was still telling people that she had a management relationship with Ellie.  'For any parent to know that

someone is out there saying that they're close with your child and they represent them is uncomfortable and unsettling,' she said, adding: 'I didn't hire her for a reason.'"  Doc. 18-1 at 7.

The plaintiffs allege that they informed defendants prior to publication that they never presented Zeiler with a management contract nor used her in a marketing deck, as no such deck existed.  ¶ 52.  Rather, Zeiler was listed on an informational deck for GIV, which Zeiler's mother approved of and from which Zeiler was removed once Zeiler's mother requested removal. *Id.*  Further, Zeiler did sign with Jacob on July 31, 2020.  ¶ 53.

After the Article was published, the cosmetics company L'Oréal informed plaintiffs that it would no longer proceed with its branding agreement with Influences.  ¶ 54.  Further, numerous other clients pulled out of their agreements with plaintiffs, citing the Article as the reason.  *Id.*  Plaintiffs allegedly subsequently lost all of their clients, and Jacob had to seek mental health treatment due to suicidal ideations following the Article.  ¶ 55.  Ultimately, Jacob had to move from California to Las Vegas to begin a new career.  ¶ 56.  Several of the influencers who were previously under contract with Influences then signed agreements with United Talent Agency ("UTA"), one of Jacob's direct competitors.  ¶ 52.  Additionally, Lorenz had, prior to publishing the Article, signed a book deal with a Simon and Schuster-affiliated company to write about social media, and UTA represented Lorenz in securing that deal.  ¶ 55.

The plaintiffs bring claims for defamation against both defendants.  The defendants moved to dismiss the complaint on December 23, 2021 for failure to state a claim.  Doc. 16.

## II.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Christie's Int'l PLC*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007));

*see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## III.   DISCUSSION

### A.  Incorporation by Reference

In considering a motion to dismiss under Rule 12(b)(6), a district court can consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  For a document to be incorporated by reference, "the complaint must make 'a clear, definite, and substantial reference to the document[ ].'"  *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).

The instant complaint makes clear, definite, and substantial references to the Article, Doc. 18-1, the prepublication communications between plaintiffs and Lorenz, Docs. 18-3; 18-4, and Tomlinson's contract with plaintiffs, Doc. 18-5.  Accordingly, these documents are incorporated by reference and will be considered in ruling on this motion.

### B.  Judicial Notice

Courts may also take judicial notice of and consider documents in the administrative record of a state agency proceeding.  *See Miller v. Saul*, No. 19 Civ. 1579 (PGG) (BCM), 2020 WL 5899520, at *3 n.3 (S.D.N.Y. Jan. 10, 2020), *report and recommendation adopted*, No. 19 Civ. 1579 (PGG) (BCM), 2020 WL 4365284 (S.D.N.Y. July 30, 2020) (citation omitted).  The Court therefore will also consider documents submitted by Tomlinson in her action before the California Labor Commission, Doc. 18-6.

### C.  Choice of Law

As a threshold matter, the Court must address the issue of which state's substantive law should apply to the claims.  The defendants argue that New York defamation law applies, while plaintiffs argue that California law applies.  The Court recognizes that because a "choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage."  *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (citation omitted).  But when facts necessary to make that determination are sufficiently clear, courts in this District have engaged in this analysis at the motion to dismiss stage.  *See, e.g.*, *id.*; *Patel v. N.Y. Life Ins. Co.*, No. 11 Civ. 4895 (JPO), 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012).

The choice-of-law rules that must be applied in a case brought under diversity jurisdiction are those of the forum state — in this case, New York.  *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).  "Under New York choice-of-law rules, the first step in the inquiry is to determine whether there is an actual conflict between the rules of the relevant jurisdictions."  *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (internal quotation marks and citations omitted).  "An actual conflict of law exists if the

applicable law from each jurisdiction provides different substantive rules, and the differences

have a significant *possible* effect on the outcome of the trial." *Holborn*, 304 F. Supp. 3d at 398

(internal quotation marks and citations omitted).  If a conflict exists, in tort cases New York

"applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers*

*Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citation omitted).  For conduct-regulating rules such

as defamation or libel, as opposed to loss-allocating rules, New York applies the law of the place

of the tort.  *Kinsey*, 991 F.3d at 176.  However, when defamation occurs in an article that is

published nationally, "there is only a presumptive rule that the law of [the] plaintiff's domicile

applies, which does not hold true . . . if with respect to the particular issue, some other state has a

more significant relationship to the issue or the parties." *Catalanello v. Kramer*, 18 F. Supp. 3d

504, 512 (S.D.N.Y. 2014).  To determine whether that is the case, New York courts

> weigh all the factors that might impact on the interests of various states in the litigation . .
> . includ[ing] where [the] plaintiff suffered the greatest injury; where the statements
> emanated and were broadcast; where the activities to which the allegedly defamatory
> statements refer took place; and the policy interests of the states whose law might apply.

*Condit v. Dunne*, 317 F. Supp. 2d 344, 353–54 (S.D.N.Y. 2004).

The parties agree that a conflict exists between New York and California libel law, since

New York has adopted an Anti-SLAPP statute, described below.  Both parties rely primarily on

*Kinsey*, in which the Second Circuit affirmed that New York defamation law applied over

District of Columbia law regarding an article published by the New York Times.  991 F.3d at

178.  Despite the fact that the events described in the allegedly defamatory article took place in

the District of Columbia and adversely affected the plaintiff's employment in the District of

Columbia, the Second Circuit held that New York had the most significant interest in the

litigation because the Times is domiciled in New York and the statements emanated from New

York, so New York had a strong policy interest "in regulating the conduct of its citizens and its media." *Id.*

The defendants argue that the same result should issue in this case because the facts are the same as in Kinsey:  the article emanated from New York, while the events described in the article occurred in California, leading to alleged injury in California.  The plaintiffs, however, highlight the fact that they were domiciled in California, whereas the plaintiff in *Kinsey* was not domiciled in the jurisdiction whose law they sought to apply (the District of Columbia); the plaintiffs thus have more of a connection to California than the plaintiff in *Kinsey* had to the District of Columbia.  *Id.*  Further, defendant Lorenz allegedly resided in California for at least some of the time that she was researching and/or drafting the article, and the article uses California sources such as the agency filings in Tomlinson's case.  Doc. 13 ¶ 10; Doc. 18-1 at 4. Despite these distinctions, the Court agrees with the defendants that New York law applies.  As the Second Circuit states, "in multistate defamation cases . . . the tort essentially lacks a locus, but rather injures plaintiff everywhere at once."  *Kinsey*, 991 F.3d at 178 (internal quotation marks and citation omitted).  Therefore, New York's "strong policy interests in regulating the conduct of its citizens and its media," *id.*, still outweigh California's interests, particularly because:

> New York, as the national center of the publishing industry, has a significant interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform. Publishers, authors, and film makers consciously attempt to mold their conduct to legal norms, with the expectation that the legal consequences of their conduct will be predictable. Their justified expectation that their conduct will be judged by the rules of jurisdictions in which they carry on their activities merits protection.

11

*Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984).  Accordingly, New York law applies.[6]

### D.  Defamation Claim

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)).  Under New York law, a defamation claim must allege "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (alterations in original) (quoting *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)).

Further, the parties agree that, if New York law applies, this lawsuit constitutes an action involving public petition and participation under N.Y. Civil Rights Law § 76-a.  This Anti-SLAPP statute[7] protects "citizens facing litigation arising from their public petition and participation."  *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021) (citation omitted).  The November 10, 2020 amendment to this statute broadened the protections to defendants by, in part, broadening the reach of the "actual malice" requirement—damages can only be recovered in such actions where the plaintiff establishes "by clear and convincing evidence that any communication which gives rise to the action was made

---

[6] The defendants argue that, even if California law applies, the claims should be dismissed because the plaintiffs fail to plead actual malice as required under California law if Lorenz is a limited public figure.  The plaintiffs dispute Lorenz's status as a public figure and thus argue that pleading actual malice is not required.  As the Court finds that New York law clearly applies, the Court need not reach this issue.

[7] "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation."

with knowledge of its falsity or with reckless disregard of whether it was false[.]"  N.Y. Civil Rights Law § 76-a(2).  Therefore, to state a claim, plaintiffs must plead "plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice."  *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (internal quotation marks and citation omitted).

### 1.  Statements Alleged to be "Substantially True"

The defendants first argue that ten of the contested statements are substantially true.[8] "'Substantial truth' is the standard by which New York law . . . determines an allegedly defamatory statement to be true or false."  *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 242 (2d Cir. 2017) (citation omitted).  A claim of defamation should be dismissed if the alleged statement is substantially true.  *Id.*  A statement is substantially true if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Id.* (internal quotation marks and citation omitted).  If "fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done."  *Id.* at 243 (quoting *Fleckenstein v. Friedman*, 193 N.E. 537 (N.Y. 1934)).  In analyzing a claim for defamation relating to a publication, the entire publication and the circumstances of its issuance must be considered.  *Id.* (citation omitted).

The Court will address each statement in turn.

### a.  Statements Regarding KND

Statement 1 is Olin's quote that that the KND residents "were expecting a quota [of brand deals] where [they] could pay [their] half of rent[.]"  Doc. 18-1 at 2; Doc. 13 ¶ 29.  The

---

[8] Statements 1, 2, 3, 6, 8, 9, 10, 11, 12, and 13.

defendants argue that this statement is true because prior to publication, plaintiffs had informed defendants that the KND residents were required to pay their share of rent and that Influences had exclusive control of their contracts, meaning Influences was solely responsible for procuring deals.  *See* Doc. 18-3 at 4.  The plaintiffs respond that their prepublication communications confirm that the agreement did not guarantee a certain number of deals.  Having reviewed the parties' prepublication communications[9] and the article, the Court finds that the statement is substantially true.  The article does not specifically say that plaintiffs had promised a quota, but rather that the KND residents had *expected* enough deals to cover rent.  Therefore, Statement 1 cannot be the basis for a defamation claim.[10]

Statement 2 is a quote from Underhill that the KND house "didn't have working Wi-Fi for a month," impacting the residents' ability to livestream and ultimately leading to financial struggles.  Doc. 18-1 at 3; Doc. 13 ¶¶ 30–31.  The plaintiffs argue that the phrase "working Wi-Fi" wrongly suggests that it was plaintiff's responsibility to provide Wi-Fi.  However, as the defendants have pointed to no evidence of this statement's substantial truth, in the prepublication communications or otherwise, they have not shown that these statements are substantially true.  Accordingly, the Court must further analyze Statement 2 to determine if it survives the motion to dismiss.

Statement 3 is that "the influencers were told [at the end of July 2020] that they would have to cover a larger share of rent," turning their dream into a "living nightmare," as described by Underhill.  Doc. 18-1 at 3; Doc. 13 ¶ 33.  The defendants argue that this statement is true,

---

[9] The communications include:  (1) a statement from Jacob, Doc. 18-3; (2) a statement from Jacob's attorney, Ben Walter; and (3) a series of emails between Laura Pallas on Pallas Management Group, Lorenz, and Walter, all responding to a series of questions from Lorenz, Doc. 18-4.

[10] The claim as to this statement is also subject to dismissal as the statement is nonactionable opinion.

because in plaintiffs' prepublication communications, they stated that Jacob had told them they would need to pay more rent.  The plaintiffs respond that they did not admit this, but rather stated that they had been letting the KND residents "slide" on paying their rent, but when the breaches of their obligations were discovered, required full payment of their half of the rent.  Having reviewed the communications, the Court finds that neither of the parties' positions are supported. The plaintiffs did not state that they had paused payment obligations and only resumed them upon discovery of agreement breaches, nor did they state that they had increased the rent. Rather, the plaintiffs stated that "[t]he kids were asked to actually pay their share of rent and expenses per the terms of their agreement."  Doc. 18-3 at 4.  Therefore, it is not clear that this statement was substantially true and the Court must further analyze Statement 3 to determine if it survives the motion to dismiss.

### b.  Statements Regarding Tomlinson

The plaintiffs allege that Statement 6 is false and defamatory because, in part, Tomlinson was signed not by Influences as the statement implies, but rather by Creator Edge.  Doc. 13 ¶ 37. The defendants argue that the statement was true because Tomlinson's agreement shows that she was signed with "Creator Edge Inc (dba 'Influences,')" and Jacob executed the contract herself. Doc. 18-5 at 2, 5.  The plaintiffs apparently concede this issue and instead focus their claim on the portion of Statement 6 wherein Tomlinson is quoted as saying that in January 2020, she had not been paid since Halloween 2019.  Doc. 18-5 at 4; Doc. 13 ¶ 36.  The plaintiffs argue that this statement implies that plaintiffs withheld money from Tomlinson when in fact it was the brands that had not yet paid.  However, the article does not state that the plaintiffs were the cause of the nonpayment; rather, it states that Tomlinson "reached out to the brands she'd worked with and discovered that she was owed tens of thousands of dollars."  Doc. 18-5 at 4.  Neither party

disputes the truth of that portion of the statement, and it provides the context necessary to demonstrate that the previous statement about not being paid is substantially true.  While the next sentences do discuss Tomlinson's complaint with the California Labor Commission in which she alleged that Jacob was withholding over $23,000, the statements do not collectively imply that the plaintiffs withheld payments from Halloween to January.[11]  Accordingly, the statement is substantially true and a claim relating to Statement 6 fails.

### c.  Statements Regarding GIV

Statement 8 is a quote from Singer that Jacob "promised brand deals, money, and opportunities."  Doc. 18-1 at 5; Doc. 13 ¶ 41.  Again, the defendants argue that plaintiffs' prepublication communications affirm that they had promised those they represented brand deals, money, and opportunities.  However, as plaintiffs argue in response and as the Court confirms, the prepublication communications do not address the issue of whether plaintiffs had to provide these opportunities to their clients.  Therefore, it is not clear that this statement was substantially true and the Court must further analyze Statement 8 to determine if it survives the motion to dismiss.

Statement 9 is Singer's statement that Jacob would arrive at the GIV house late at night, text them late at night, bring guests without notice, and installed cameras in the house without their consent.  Doc. 18-1 at 5; Doc. 13 ¶ 42.  The defendants again argue that plaintiffs' prepublication communications confirm these events.  *See, e.g.*, Doc. 18-3 at 7 ("There was one camera installed in the kitchen in June-July for the safety of the individuals living there. . . . [E]ach individual was informed about [the cameras.]"); Doc. 18-4 at 3 ("Jacob runs a business

---

[11] The statements regarding Tomlinson's California complaint are also nonactionable under N.Y. Civil Rights Law § 74, which states that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding . . . or other official proceeding."  The plaintiffs concede that this portion of the statement is covered by the fair report privilege.

that requires her to work 24-7. . . . Jacob brought guests to her house.").  These communications

do establish the substantial truth about the portions of the statement regarding the texts and

guests, but do not establish the substantial truth of statement regarding the installation of cameras

without consent, because Jacob stated that they were informed about the cameras.  Therefore, the

portion of Statement 9 referring to installation of the cameras must be further analyzed, but the

claim as to the remainder of the statement is dismissed.

Statement 10 is that Jacob required the GIV residents to post eight social media posts per

day to continue living in the house.  Doc. 18-1 at 5; Doc. 13 ¶ 43.  The defendants argue that

plaintiffs confirmed in prepublication communications that the residents needed to "create and

post a certain number of contractual social media posts" or else "would need to leave the content

house."  Doc. 18-3 at 4, 7.  The plaintiffs have not disputed this argument, Doc. 22 at 18 n.9, and

the Court agrees that the communications establish the statement's substantial truth.  Therefore,

the defamation claim as to Statement 10 is dismissed.

Statement 11 is that when several GIV members moved out of the house, there was "an

escalating verbal fight with Ms. Jacob which resulted in several calls to local authorities to

intervene."  Doc. 18-1 at 6; Doc. 13 ¶¶ 46–47.  The defendants argue that this statement is true,

as confirmed by the complaint itself in which the plaintiffs allege that the influencers were

"aggressive and threatening" resulting in Jacob calling the authorities twice.  Doc. 13 ¶ 47.  The

plaintiffs argue that the article's description implies that it was the influencers who called the

police regarding Jacob's behavior, but do not dispute the statement's "literal truth."  Doc. 22 at

12.  Accordingly, the statement is substantially true and the defamation claim as to Statement 11

is dismissed.

### d.  Statements Regarding Drip Crib

Statement 12 is the quote from Young that Jacob leaked nude photographs of him and sent them to business partners, roommates, and potential investors, calling him unprofessional. Doc. 18-1 at 6; Doc. 13 ¶ 49.  The defendants argue that plaintiffs have confirmed that Jacob informed a third-party of Young's nudes, rendering the quote true.  *See* Doc. 18-4 at 22. However, the plaintiffs stated prepublication that "Jacob informed an internal consultant [under an NDA] of the pictures['] existence" but did not "leak" the photos.  *Id.*  Such behavior is far from the behavior described in Young's quote.  Accordingly, Statement 12 is not substantially true and must be analyzed as to the remaining defamation elements.

Statement 13 is that Influences "split from [Drip Crib] over disputes about rent" and posted on its Instagram account that members of Drip Crib breached their contract.  Doc. 18-1 at 6; Doc. 13 ¶ 50.  The defendants argue that the article accurately reported the statements plaintiffs made on their own Instagram account.  The plaintiffs have not disputed this argument, Doc. 22 at 18 n.9, so the defamation claim as to Statement 13 is dismissed.[12]

### 2.  No Defamatory Meaning

The defendants further argue that Statements, 4, 5, 7, and 13 are not capable of defamatory meaning and should be dismissed.  As the Second Circuit has explained:

> A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication.  If the statement is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory.  If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood.

*Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (internal quotation marks and citations omitted).  A statement is defamatory if it "exposes an individual to public

---

[12] The claim as to this statement must also be dismissed due to lack of defamatory meaning.

hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Id.* at 177 (internal quotation marks and citations omitted).

Statement 4 is that Jacob messaged Tomlinson to ask if she had "made any money" after one of Tomlinson's videos went viral.  Doc. 18-1 at 4; Doc. 13 ¶ 34.  The plaintiffs concede in their response to this motion that this statement is not defamatory in itself and they only include mention of it in the complaint to show that the article as a whole created "the false gist that Plaintiffs acted unethically[.]"  Doc. 22 at 14.  The same is true for Statement 7 quoting experts describing what generally occurs in ethical talent agreements.[13]  *See* Doc. 18-1 at 5; Doc. 13 ¶ 39.  Such statements are not susceptible to defamatory meaning on their own.  Accordingly, any defamation claims regarding Statements 4 and 7 are dismissed.

Statement 5 states in part that "Mr. Vaynerchuk said he has no affiliation with Influences," following Tomlinson's statement that Jacob told her she was mentored by Gary Vaynerchuk.  Doc. 18-1 at 4; Doc. 13 ¶ 35.  While the plaintiffs argue that this statement implies that Jacob lied about the fact of Vaynerchuk mentoring her, the Court disagrees.  As the defendants argue, the parenthetical means exactly what it says—that Vaynerchuk is not affiliated with Influences, despite any association with Jacob.  Accordingly, the defamation claim as to Statement 5 is dismissed.

Lastly, the Court also dismisses Statement 2,[14] Underhill's quote regarding lack of Wi-Fi leading to financial struggles, as it finds that there is no potential defamatory meaning to the

---

[13] These statements from the two "experts" are also nonactionable opinions.

[14] The defendants do indicate in their chart enumerating the statements that Statement 2 has no defamatory meaning, but they do not make any arguments in support of that assertion in their memorandum in support of the motion.

statements.  The quote does not refer to plaintiffs as the cause of the Wi-Fi problems.

Accordingly, the claim as to Statement 2 is dismissed.

### 3.   Hyperbole and Opinion

The defendants also argue that six Statements are not defamatory because they are

expressions of opinion or hyperbole.[15]  "Among other questions of law, courts are charged with

distinguishing between statements of fact, which may be defamatory, and expressions of opinion,

which 'are not defamatory; instead, they receive absolute protection under the New York

Constitution.'"  *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15 Civ. 4779

(LTS) (SN), 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (quoting *Tucker v. Wyckoff*

*Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)).  Further, loose, figurative, or

hyperbolic language cannot give rise to a defamation claim.  *See Milkovich v. Lorain J. Co.*, 497

U.S. 1, 17 (1990).

Statement 3 is Underhill's quote that living with friends became "a living nightmare."

Doc. 18-1 at 3; Doc. 13 ¶ 28.  Such statements have been dismissed as non-actionable opinion or

hyperbole.  *See, e.g.*, *Marom v. Pierot*, No. 18 Civ. 12094 (VB) (JCM), 2020 WL 6572509, at

*11 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, No. 18 Civ. 12094 (VB),

2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) (dismissing statement made in the context of a

"rambling . . . monologue" that a house was a "nightmare").  The Court, and even plaintiffs,[16]

agree that this statement is not actionable.  However, it is preceded by the statement that Jacob

told the KND residents that they would have to "cover a larger share of rent."  That portion of

Underhill's statement is neither hyperbole nor opinion and is susceptible to defamatory meaning,

---

[15] Statements 1, 3, 7, 8, 11, and 12.  Statements 1 and 11 have already been dismissed above as substantially true, and Statement 7 is dismissed above as lacking defamatory meaning.

[16] *See* Doc. 22 at 23.

as it could suggest that Jacob acts unfairly by surprising her clients with burdensome terms. Therefore, it will not be dismissed on this basis.

Statement 7, the expert opinions on what an ethical management talent relationship looks like, is even described by plaintiffs in the complaint as opinion, ¶ 39.  The plaintiffs concede that it is nonactionable in itself.  Accordingly, although already dismissed above as having no defamatory meaning, it is also dismissed as an opinion.

Statement 8 is quotes from Singer's mother that Jacob "promised brand deals, money and opportunities" that never happened, leading to "shameful" behavior by Jacob as the girls ended up moving out of the house.  Doc. 18-1 at 7; Doc. 13 ¶ 51.  Further, Singer's mother explained the potential for a "predatory environment" in which "young vulnerable people with the potential to access a lot of money" interact with "older people who are going to take advantage of the situation."  *Id.*  She concludes:  "Tianna's not going to be the first or the last."  *Id*.  The defendants argue that these statements are opinion, as at least one court in this district has held that similarly hypothetical statements are not defamatory.  *See Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 311–12 (S.D.N.Y. 2017) (holding that a statement describing events as including "varying degrees of what many people might view as extortion, manipulation, fraud, and deceit . . . *by someone I know*" was not defamatory because (1) the plaintiff was not named in the statement; (2) the statement cannot be proven false; and the allegation is too "loose, figurative, or hyperbolic" to be actionable).  However, here, Singer's mother does identify the plaintiffs and states that Jacob promised brand deals, money and opportunities that never happened can be proven false.  While the hypothetical comments regarding taking advantage of vulnerable young people are not actionable, the central statement that plaintiffs made promises that were not kept is actionable.

The defendants also argue that Statement 12, Young's statements regarding the leaked nude photos, are protected opinion. While his statement that Jacob manipulates people and "it's a nightmare" can be characterized as opinion, the further statements that Jacob leaked his nudes is not opinion, as it can be proved true or false. Accordingly, Statement 12 is actionable.

### 4.  Actual Malice

The defendants next argue that the plaintiffs have failed to plead actual malice, as required by New York's Anti-SLAPP Law. To allege actual malice, a plaintiff must allege that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). "[T]he critical question is the state of mind of those responsible for the publication." *Palin v. New York Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019). Therefore, it is Lorenz's state of mind as the author of the article that is relevant. *See id.*

The five statements that have not yet been dismissed are:

(1) Portion of Statement 3 that Jacob told the KND residents that they would have to cover a larger share of rent

(2) Portion of Statement 8 that Jacob promised the GIV residents "brand deals, money and opportunities" that never materialized

(3) Portion of Statement 9 that Jacob installed a security camera in the kitchen of the GIV house without the residents' consent

(4) Portion of Statement 12 that Jacob leaked Young's nudes to business partners

(5) Statement 14 that Jacob had made false representations that she was managing Ellie Zeiler and had added her name and photograph to the Influences marketing deck without the mother's permission

The parties do not make arguments as to the actual malice of each individual statement, but rather generally argue about whether the article as a whole was published with actual malice.

The plaintiffs make six arguments as to the adequacy of their actual malice allegations. First, they point to their allegation that the article was written with a "commitment to a pre-conceived narrative." Doc. 13 ¶¶ 25, 35, 41, 50, 62–63. However, the single case they cite in support, *Veritas v. The New York Times Co.*, No. 63921/2020, 2021 WL 2395290, at *7 (N.Y. Sup. Ct. Mar. 18, 2021), does not address whether an allegation of a preconceived narrative is sufficient to allege actual malice.[17] Their second argument is that Lorenz sent them a long list of questions with a quick deadline prior to publication of the article, constituting a "sham investigation into the details of the [a]rticle" and purposeful avoidance of the truth. Doc. 13 ¶¶ 22–24, 62. They cite no cases in support of their argument that allegations of last-minute inquiries prior to publication of an allegedly defamatory article can raise an inference of actual malice. Third, they argue that defendants provided sufficient evidence in their prepublication responses that would cause a prudent and diligent person to entertain serious doubts about the truths of the allegations. *See, e.g.*, *id.* ¶¶ 48, 52, 53; Doc. 22-2. In support of this argument, they cite *Palin*, 940 F.3d at 815. They argue that the Second Circuit held that evidence that a writer was aware of contradictory information was sufficient to give rise to a plausible inference of actual malice. However, the Second Circuit only stated that awareness of the contradictory information "gives rise to more than one plausible inference." *Id.* Further, the prepublication communications alone simply do not "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication," *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)), particularly because Lorenz received contradictory information from multiple other

---

[17] The reasoning in this decision is not detailed, and the allegation of a preconceived narrative is just one of eight allegations that resulted in a holding that "there is a substantial basis in law and fact that Defendants acted with actual malice." It is not clear that the Court relied at all on the allegation of a preconceived narrative in reaching that holding.

sources (the influencers).  Fourth, the plaintiffs point to the fact that the defendants used off the record sources for the article but did not allow the plaintiffs to provide documents in support of their version of events off the record.  *See, e.g.*, Doc. 13 ¶ 63, 65; Doc. 22-2 (Lorenz stating "I would also welcome any emails, texts or documents Ms. Jacob is willing to share on the record.").  In support, plaintiffs cite *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989), in which the Supreme Court stated that circumstantial evidence of departure from accepted journalistic standards could constitute some circumstantial evidence of state of mind relevant to an actual malice inquiry.  However, plaintiffs have not sufficiently alleged beyond mere conclusory statements in the instant case that refusing off the record documents would in fact be such a departure.  Fifth, plaintiffs argue that defendants ignored their prepublication denials of the truth of the allegedly defamatory statements.  *See* Doc. 13 ¶ 65.  Sixth, plaintiffs point to their allegation that Lorenz had a personal motivation to disparage plaintiffs due to their status as competitors of UTA, the talent agency that represented Lorenz in her book deal signed just prior to publication of the article.  *See* Doc. 13 ¶¶ 58, 64; *Harte-Hanks*, 491 U.S. at 668 ("it cannot be said that evidence concerning motive . . . never bears any relation to the actual malice inquiry").  Overall, the plaintiffs argue that while these factors may not individually lead to an allegation of actual malice, pled together they do adequately raise the inference of actual malice.

The defendants point out that denial of the veracity of allegedly defamatory information is not enough, as "such denials are so commonplace in the world of polemical charge and counitercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."  *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977); *see also Contemp. Mission, Inc. v. New York Times Co.*, 665 F. Supp. 248, 270 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988) ("Publication in the face of a denial by plaintiffs of a

statement's truth does not demonstrate actual malice.").  For the same reasons, they argue that their refusal to consider off the record evidence and their delay in reaching out to the plaintiffs for comment prepublication cannot constitute evidence of actual malice.  Further, the defendants argue that failure to verify statements with the plaintiff before publication does not constitute actual malice.  *See, e.g.*, *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("failure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard of the truth").  The Court agrees.  None of plaintiffs' allegations regarding the manner or method of verifying statements with the plaintiffs amount to an allegation of actual malice.

Additionally, defendants dispute the allegation of an economic motive, as they argue that allegations of improper motives in publishing do not on their own establish actual malice.  *See Harte-Hanks*, 491 U.S. at 665 ("a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice").

The Court agrees with defendants.  If anything, Lorenz's behavior in reaching out to plaintiffs prior to publication evinces appropriate regard for the truthfulness of the publication, even if that outreach was conducted only shortly before publication.  As a whole, the complaint does not sufficiently allege actual malice as to each of the remaining statements.  Accordingly, the motion to dismiss is granted.

### 5.  Defamation By Implication

The plaintiffs repeatedly point to the "implications" and "gist" of the Article in opposition to the defendants' motion.  Under New York law, plaintiffs may bring a claim for defamation by implication, which involves 'false suggestions, impressions and implications arising from otherwise truthful statements.'"  *Levin v. McPhee*, 119 F.3d 189, 196 n.5 (2d Cir.

1997) (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381 (N.Y. 1995)).

However, the plaintiffs do not bring a count for such a claim against the defendants, and even if

they did, the claim would fail.  "To survive a motion to dismiss a claim for defamation by

implication [under New York law] . . . the plaintiff must make a rigorous showing that the

language of the communication as a whole can be reasonably read both to impart a defamatory

inference and to affirmatively suggest that the author intended or endorsed that inference."

*Kavanagh v. Zwilling*, 578 F. App'x 24, 24–25 (2d Cir. 2014) (summary order) (quoting

*Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (N.Y. App. Div. 2014).  For the same

reasons discussed above, the plaintiffs have not made such a showing.

### E.  Leave to Amend

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a

pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has instructed

courts not to dismiss a complaint "without granting leave to amend at least once when a liberal

reading of the complaint gives any indication that a valid claim might be stated."  *Shabazz v.*

*Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176,

183 (2d Cir. 2009)).  In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second

Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against the dismissal of

claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of

those claims.  797 F.3d 160, at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214

(2d Cir. 2011) (per curiam)).

Here, amendment of many of the claims would be futile – the statements dismissed due to

being true, lacking defamatory meaning, or being hyperbole or opinion cannot be saved by

amendment.  However, it is possible that plaintiffs could plead further information to

demonstrate actual malice.  Accordingly, the Court will allow plaintiffs to amend the complaint to further allege actual malice as to the five statements identified above in Section D(4).

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is granted.  Plaintiffs may file an amended complaint, if at all, by October 5, 2022.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 16.

It is SO ORDERED.


Dated:    September 7, 2022
          New York, New York

_____

                                    Edgardo Ramos, U.S.D.J.